**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NOT A REAL HOLDING COMPANY INC., <br><br> Plaintiff, <br><br> v. <br><br> THE PARTNERSHIPS and UNINCORPORATED ASSOCIATIONS IDENTIFIED ON SCHEDULE "A", <br><br> Defendants. | Case No. 22-cv-04776 <br><br> **Judge Sara L. Ellis** <br><br> **Magistrate Judge Sunil R. Harjani** |

**AMENDED COMPLAINT**

Plaintiff Not a Real Holding Company Inc. ("Plaintiff") hereby brings the present action against the Partnerships and Unincorporated Associations Identified on Schedule A attached hereto (collectively, "Defendants") and alleges as follows:

## I.     JURISDICTION AND VENUE

1.     This Court has original subject matter jurisdiction over Plaintiff's claims pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, *et seq.*, 28 U.S.C. § 1338(a)-(b) and 28 U.S.C. § 1331.

2.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction over Defendants because Defendants structure their business activities so as to target consumers in the United States, including Illinois, through at least the fully interactive e-commerce stores operating under the aliases identified on Schedule A attached hereto (the "Seller Aliases"). Specifically, Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers, offer

1

shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, have sold products using infringing and counterfeit versions of Plaintiff's federally registered trademark (collectively, the "Unauthorized Products") to residents of Illinois. Each of the Defendants is committing tortious acts in Illinois, is engaging in interstate commerce, and has wrongfully caused Plaintiff substantial injury in the state of Illinois.

## II. INTRODUCTION

3. Plaintiff filed this case to prevent e-commerce store operators who trade upon Plaintiff's reputation and goodwill from further selling and/or offering for sale Unauthorized Products. Defendants create e-commerce stores under one or more Seller Aliases and then advertise, offer for sale, and/or sell Unauthorized Products to unknowing consumers. E-commerce stores operating under the Seller Aliases share identifiers, such as design elements and similarities of the Unauthorized Products offered for sale, establishing that a logical relationship exists between them, and that Defendants' counterfeiting operation arises out of the same transaction, occurrence, or series of transactions or occurrences. Defendants take advantage of a set of circumstances, including the anonymity and mass reach afforded by the Internet and the cover afforded by international borders, to violate Plaintiff's intellectual property rights with impunity. Defendants attempt to avoid liability by operating under one or more Seller Aliases to conceal both their identities, locations, and the full scope and interworking of their counterfeiting operation. Plaintiff is forced to file this action to combat Defendants' counterfeiting of its registered trademark, as well as to protect consumers from purchasing Unauthorized Products over the internet. Plaintiff has been, and continues to be, irreparably damaged through consumer confusion and dilution of its valuable trademark because of Defendants' actions and therefore seeks injunctive and monetary relief.

2

### III.    THE PARTIES

4.    Plaintiff Not a Real Holding Company Inc. is a Canadian corporation having its principal place of business at 35 McCaul Street, Suite 405, Toronto, Ontario, Canada M5T1V7 and is the owner of the trademark rights asserted in this action.

5.    Plaintiff's sister company, Not a Real Company Productions, Inc., produced the critically acclaimed and widely-adored television series *Schitt's Creek*.  *Schitt's Creek* is a Canadian television sitcom created by Dan Levy and his father, Eugene Levy, that aired on CBC Television from 2015 to 2020 and premiered on Netflix in 2017.  The show centers on a wealthy video store magnate, Johnny Rose (Eugene Levy), his former soap-star wife Moira (Catherine O'Hara), and their spoiled adult children - son David (Daniel Levy) and daughter Alexis (Annie Murphy). When the Roses suddenly finds themselves broke, they are forced to leave their lavish lifestyles and move to Schitt's Creek, a town that Johnny bought years earlier as a joke.

6.    In 2019, *Schitt's Creek* was nominated for Outstanding Comedy Series, Outstanding Lead Actor for Eugene Levy, and Outstanding Lead Actress for Catherine O'Hara at the Primetime Emmy Awards.  In 2020, the show made history by sweeping all seven Primetime Emmy Awards comedy categories, including Outstanding Comedy Series. *Schitt's Creek* was the first series to sweep every comedy category.  The show then won the 2021 Golden Globe for Best Television Series – Musical or Comedy, while Catherine O'Hara took home best Actress in a Television Series – Musical or Comedy.  *Schitt's Creek* has blossomed into a cult classic and stands as one of the best sitcoms of the last decade.

7.    Plaintiff markets and sells a variety of products emanating from *Schitt's Creek*, including clothing, puzzles, keychains, signs, bags, blankets, cups, and other merchandise bearing Plaintiff's SCHITT'S CREEK trademark (collectively, "Plaintiff's Products").    Plaintiff's

Products have become enormously popular and even iconic, driven by Plaintiff's quality standards and innovative designs. Among the purchasing public, Plaintiff's Products are instantly recognizable as such. Plaintiff's Products are distributed and sold to consumers through Plaintiff's website, schittscreek.shop.

8.     Plaintiff has used the SCHITT'S CREEK trademark and has continuously sold products under the SCHITT'S CREEK trademark ("Plaintiff's Trademark"). As a result of this long-standing use, strong common law trademark rights have amassed in Plaintiff's Trademark. Plaintiff's use of the mark has also built substantial goodwill in Plaintiff's Trademark. Plaintiff's Trademark is a famous mark and valuable asset of Plaintiff. Many of Plaintiff's Products include Plaintiff's Trademark.

9.     Plaintiff's Trademark is registered with the United States Patent and Trademark Office, which is included below.

| Registration Number | Trademark | Registration Date | Goods and Services |
|---|---|---|---|
| 5,964,319 | SCHITT'S CREEK | Jan. 21, 2020 | For: Sound recordings featuring musical soundtracks and audio from comedic and musical television programs; motion picture films featuring comedy and pre-recorded video tapes featuring television programs in the field of comedy and music; pre-recorded audio tapes featuring musical soundtracks and audio from comedic and musical television programs, video cassettes, video tapes, |

|  |  |  | video discs and digital video discs containing television programs in the fields of comedy; recorded magnetic tapes with sounds and images in the fields of comedic television programs and music; phonograph records and disks, namely, pre-recorded phonograph records and disks featuring musical soundtracks and audio from comedic and musical television programs; interactive games, namely, interactive game software; computer game programs; video game programs; phonograph recordings featuring musical soundtracks and audio from comedic and musical television programs and holders for pre-recorded CDs and cassettes in class 009.<br><br>For: Printed matter, namely, books in the fields of television programs in particular behind the scenes information about the television programs, posters, greeting cards, calendars, comic books; stationery, writing paper and envelopes, writing |

| | | | pads, paper party decorations, transfers in the nature of decalcomanias, photograms; bumper stickers; pens; pencils; paint brushes; trading cards in class 016.

For: Gym bags, backpacks, purses, luggage; key chains of leather or imitation leather in class 018.

For: Key chains of plastic; figurines of plastic, pillows being bedding, home accessories, namely, pillows in class 020.

For: Travel mugs; drinking glasses; coffee cups; mugs in class 021.

For: Towels, namely, beach towels; home accessories, namely, throws in class 024.

For: Men's, women's and children's clothing, namely, hats, toques, t-shirts, jackets, pants, shorts, skirts, dresses, sweatshirts, shirts and hooded sweatshirts; footwear; costumes, namely, Halloween costumes, masquerade costumes in class 025.

For: Board games; |

| | | | interactive games, namely, interactive board games, action skill games, parlor games, party games, role-playing games, table top games; playing cards; card games in class 028.

For: Entertainment services, namely, production of television programs, the production and distribution of television programs and live entertainment features in the nature of plays, comedy shows, and reality television programs; production of pre-recorded audio tapes, video cassettes, video tapes, video discs and digital video discs for others; production of motion pictures and television features; providing entertainment information about television programs, games, fan sites and clubs via an internet website; online publication of newsletters regarding television programs in class 041.

For: Customizable web space for website members, namely, |
|---|---|---|---|

| | | | providing a website featuring technology that enables users to customize personalized web space, and post comments and videos in class 042. |
|---|---|---|---|

10.     The above U.S. registration for Plaintiff's Trademark is valid, subsisting, and in full force and effect.  The registration for Plaintiff's Trademark constitutes *prima facie* evidence of its validity and of Plaintiff's exclusive right to use Plaintiff's Trademark pursuant to 15 U.S.C. § 1057(b).  A true and correct copy of the United States Registration Certificate for Plaintiff's Trademark is attached hereto as **Exhibit 1**.

11.     Plaintiff's Trademark is exclusive to Plaintiff and is displayed extensively on Plaintiff's Products and in marketing and promotional materials.  Plaintiff's Trademark is also distinctive when applied to Plaintiff's Products, signifying to the purchaser that the products come from Plaintiff or its licensees and are manufactured to Plaintiff's quality standards.  Whether Plaintiff manufactures the products itself or contracts with others to do so, Plaintiff has ensured that its licensed products bearing Plaintiff's Trademark are manufactured to the highest quality standards.

12.     Plaintiff's Trademark is a famous mark, as that term is used in 15 U.S.C. § 1125(c)(1) and has been continuously used and never abandoned.  The success of the *Schitt's Creek* series, in addition to the marketing of Plaintiff's Products, has enabled the *Schitt's Creek* brand ("Schitt's Creek Brand") to achieve widespread recognition and fame and has made Plaintiff's Trademark one of the most well-known marks in the entertainment industry.  The

widespread fame, outstanding reputation, and significant goodwill associated with the Schitt's Creek Brand have made Plaintiff's Trademark a valuable asset of Plaintiff.

13.     Products bearing Plaintiff's Trademark have been the subject of substantial and continuous marketing and promotion.  Plaintiff has and continues to market and promote Plaintiff's Trademark in the industry and to consumers through its website schittscreek.shop.

14.     Plaintiff has expended substantial time, money, and other resources advertising, promoting, and marketing Plaintiff's Products.  Plaintiff's Products have also been the subject of extensive unsolicited publicity due to the longstanding success of the Schitt's Creek Brand.  As a result, products bearing Plaintiff's Trademark are widely recognized and exclusively associated by consumers as being high-quality products sourced from Plaintiff or its licensees.  Plaintiff's Products have become among the most popular of their kind in the world.  Plaintiff's Trademark has achieved tremendous fame and recognition, adding to the inherent distinctiveness of the mark. As such, the goodwill associated with Plaintiff's Trademark is of immeasurable value to Plaintiff.

15.     Plaintiff's Products are sold only by Plaintiff or through authorized licensees and are recognized by the public as being exclusively associated with the Schitt's Creek Brand.

16.     Defendants are unknown individuals and business entities who own and/or operate one or more of the e-commerce stores under the Seller Aliases identified on Schedule A and/or other seller aliases not yet known to Plaintiff.  On information and belief, Defendants reside and/or operate in primarily Asian countries or other foreign jurisdictions and redistribute products from the same or similar sources in those locations.  Defendants have the capacity to be sued pursuant to Federal Rules of Civil Procedure 17(b).

17.     On information and belief, Defendants, either individually or jointly, operate one or more e-commerce stores under the Seller Aliases listed in Schedule A attached hereto.  Tactics

9

used by Defendants to conceal their identities and the full scope of their operation make it virtually impossible for Plaintiff to learn Defendants' true identities and the exact interworking of their counterfeit network. If Defendants provide additional credible information regarding their identities, Plaintiff will seek leave to amend the Amended Complaint.

## IV. DEFENDANT'S UNLAWFUL CONDUCT

18. The success of the Schitt's Creek Brand has resulted in significant counterfeiting of Plaintiff's Trademark. Because of this, Plaintiff has implemented an anti-counterfeiting program that involves investigating suspicious websites and online marketplace listings identified in proactive Internet sweeps. Recently, Plaintiff has identified many fully interactive e-commerce stores offering Unauthorized Products on online marketplace platforms such as Alibaba Group Holding Ltd. ("Alibaba"), AliExpress, Inc. ("AliExpress"), Amazon, Inc. ("Amazon"), eBay, Inc. ("eBay"), Etsy, Inc. ("Etsy"), DHgate.com ("DHgate"), Fruugo.com ("Fruugo"), Redbubble Inc. ("Redbubble"), Spreadshirt, Inc. ("Spreadshirt"), and ContextLogic, Inc. ("Wish"), including the e-commerce stores operating under the Seller Aliases. The Seller Aliases target consumers in this Judicial District and throughout the United States. According to a report prepared for The Buy Safe America Coalition, most counterfeit products now come through international mail and express courier services (as opposed to containers) due to increased sales from offshore online counterfeiters. *The Counterfeit Silk Road: Impact of Counterfeit Consumer Products Smuggled Into the United States*, prepared by John Dunham & Associates (**Exhibit 2**).

19. Because the counterfeit products do not enter normal retail distribution channels, the US economy lost an estimated 300,000 or more full-time jobs in the wholesale and retail sectors alone in 2020. *Id*. When accounting for lost jobs from suppliers that would serve these retail and wholesale establishments, and the lost jobs that would have been induced by employees re-

10

spending their wages in the economy, the total economic impact resulting from the sale of counterfeit products was estimated to cost the United States economy over 650,000 full-time jobs that would have paid over $33.6 billion in wages and benefits. *Id.* Additionally, it is estimated that the importation of counterfeit goods costs the United States government nearly $7.2 billion in personal and business tax revenues in the same period. *Id.*

20. Online marketplace platforms like those used by Defendants do not adequately subject new sellers to verification and confirmation of their identities, allowing counterfeiters to "routinely use false or inaccurate names and addresses when registering with these e-commerce platforms." **Exhibit 3**, Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 NW. J. INT'L L. & BUS. 157, 186 (2020); *see also* report on "Combating Trafficking in Counterfeit and Pirated Goods" prepared by the U.S. Department of Homeland Security's Office of Strategy, Policy, and Plans (Jan. 24, 2020), attached as **Exhibit 4**, and finding that on "at least some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling" and that "[t]he ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders". Counterfeiters hedge against the risk of being caught and having their websites taken down from an e-commerce platform by establishing multiple virtual storefronts. **Exhibit 4** at p. 22. Since platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity, counterfeiters can have many different profiles that can appear unrelated even though they are commonly owned and operated. **Exhibit 4** at p. 39. Further, "[e]-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of counterfeits and counterfeiters." **Exhibit 3** at 186-187. Specifically, brand owners are

forced to "suffer through a long and convoluted notice and takedown procedure only [for the counterfeit seller] to reappear under a new false name and address in short order". *Id.* at p. 161.

21.     Defendants have targeted sales to Illinois residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, including Illinois, accept payment in U.S. dollars and, on information and belief, have sold and/or offered for sale Unauthorized Products to residents of Illinois.

22.     Defendants concurrently employ and benefit from similar advertising and marketing strategies.  For example, Defendants facilitate sales by designing the e-commerce stores operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers, outlet stores, or wholesalers.  E-commerce stores operating under the Seller Aliases appear sophisticated and accept payment in U.S. dollars in multiple ways, including via credit cards, Alipay, Amazon Pay, and/or PayPal.  E-commerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish their stores from an authorized retailer. Plaintiff has not licensed or authorized Defendants to use Plaintiff's Trademark, and none of the Defendants are authorized retailers of Plaintiff's Products.

23.     Many Defendants also deceive unknowing consumers by using Plaintiff's Trademark within the content, text, and/or meta tags of their e-commerce stores to attract consumers using search engines to find websites relevant to Plaintiff's Products. Other e-commerce stores operating under the Seller Aliases omit using Plaintiff's Trademark in the item title to evade enforcement efforts while using strategic item titles and descriptions that will trigger their listings when consumers are searching for Plaintiff's Products.

24.     E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading and/or incomplete

information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

25.     E-commerce store operators like Defendants regularly register or acquire new seller aliases for the purpose of offering for sale and selling Unauthorized Products.  Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities and the full scope and interworking of their counterfeiting operation, and to avoid being shut down.

26.     Even though Defendants operate under multiple fictitious aliases, the e-commerce stores operating under the Seller Aliases often share unique identifiers, such as templates with common design elements that intentionally omit contact information or other information for identifying Defendants or other Seller Aliases they operate or use. E-commerce stores operating under the Seller Aliases include other common features, such as registration patterns, accepted payment methods, check-out methods, keywords, advertising tactics, similarities in price and quantities, the same incorrect grammar and misspellings, and/or the use of the same text and images. Additionally, Unauthorized Products for sale by the Seller Aliases bear similar irregularities and indicia of being counterfeit to one another, suggesting that the Unauthorized Products were manufactured by and come from a common source and that Defendants are interrelated.

27.     E-commerce store operators like Defendants are in constant communication with each other and regularly participate in QQ.com chat rooms and through websites such as sellerdefense.cn, kaidianyo.com, and kuajingvs.com regarding tactics for operating multiple accounts, evading detection, pending litigation, and potential new lawsuits.

13

28.     Counterfeiters such as Defendants typically operate under multiple seller aliases and payment accounts so that they can continue operation despite Plaintiff's enforcement. Ecommerce store operators like Defendants maintain off-shore bank accounts and regularly move funds from their financial accounts to offshore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment awarded to plaintiffs.

29.     Defendants are working in active concert to knowingly and willfully manufacture, import, distribute, offer for sale, and sell Unauthorized Products in the same transaction, occurrence, or series of transactions or occurrences.  Defendants, without any authorization or license from Plaintiff have, jointly and severally, knowingly and willfully used and continue to use Plaintiff's Trademark in connection with the advertisement, distribution, offering for sale, and sale of Unauthorized Products into the United States and Illinois over the Internet.

30.     Defendants' unauthorized use of Plaintiff's Trademark in connection with the advertising, distribution, offering for sale, and sale of Unauthorized Products, including the sale of Unauthorized Products into the United States, including Illinois, is likely to cause, and has caused, confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiff.

## COUNT I
## TRADEMARK INFRINGEMENT AND COUNTERFEITING (15 U.S.C. § 1114)

31.     Plaintiff hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

32.     This is a trademark infringement action against Defendants based on their unauthorized use in commerce of counterfeit imitations of Plaintiff's Trademark in connection with the sale, offering for sale, distribution, and/or advertising of infringing goods.  Plaintiff's

14

Trademark is a highly distinctive mark. Consumers have come to expect the highest quality from Plaintiff's Products offered, sold, or marketed under Plaintiff's Trademark.

33.     Defendants have sold, offered to sell, marketed, distributed, and advertised, and are still selling, offering to sell, marketing, distributing, and advertising products using counterfeit reproductions of Plaintiff's Trademark without Plaintiff's permission.

34.     Plaintiff's United States registration for Plaintiff's Trademark (Exhibit 1) is in full force and effect. Upon information and belief, Defendants have knowledge of Plaintiff's rights in Plaintiff's Trademark and are willfully infringing and intentionally using infringing and counterfeit versions of Plaintiff's Trademark. Defendants' willful, intentional, and unauthorized use of Plaintiff's Trademark is likely to cause, and is causing, confusion, mistake, and deception as to the origin and quality of the Unauthorized Products among the general public.

35.     Defendants' activities constitute willful trademark infringement and counterfeiting under Section 32 of the Lanham Act, 15 U.S.C. § 1114.

36.     Plaintiff has no adequate remedy at law, and if Defendants' actions are not enjoined, Plaintiff will continue to suffer irreparable harm to its reputation and the goodwill of Plaintiff's Trademark.

37.     The injuries and damages sustained by Plaintiff have been directly and proximately caused by Defendants' wrongful reproduction, use of advertisement, promotion, offering to sell, and/or sale of Unauthorized Products.

## COUNT II
## FALSE DESIGNATION OF ORIGIN (15 U.S.C. § 1125(a))

38.     Plaintiff hereby re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

39.     Defendants' promotion, marketing, offering for sale, and sale of Unauthorized Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection, or association with Plaintiff or the origin, sponsorship, or approval of Defendants' Unauthorized Products by Plaintiff.

40.     By using Plaintiff's Trademark in connection with the offering for sale and/or sale of Unauthorized Products, Defendants create a false designation of origin and a misleading representation of fact as to the origin and sponsorship of the Unauthorized Products.

41.     Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Unauthorized Products to the general public involves the use of counterfeit marks and is a willful violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125.

42.     Plaintiff has no remedy at law and will continue to suffer irreparable harm to its reputation and the associated goodwill of the Schitt's Creek Brand if Defendants' actions are not enjoined.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1)     That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them be temporarily, preliminarily, and permanently enjoined and restrained from:

   a.  using Plaintiff's Trademark or any reproduction, counterfeit copies or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not one of Plaintiff's Products or is not authorized by Plaintiff to be sold in connection with Plaintiff's Trademark;

b. passing off, inducing, or enabling others to sell or pass off any product as one of Plaintiff's Products or any other product produced by Plaintiff, that is not Plaintiff's or not produced under the authorization, control, or supervision of Plaintiff and approved by Plaintiff for sale under Plaintiff's Trademark;

c. committing any acts calculated to cause consumers to believe that Defendants' Unauthorized Products are those sold under the authorization, control, or supervision of Plaintiff, or are sponsored by, approved by, or otherwise connected with Plaintiff;

d. further infringing Plaintiff's Trademark and damaging Plaintiff's goodwill; and

e. manufacturing, shipping, delivering, holding for sale, transferring, or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiff, nor authorized by Plaintiff to be sold or offered for sale, and which bear any of Plaintiff's Trademark;

2) Entry of an Order that, upon Plaintiff's request, those with notice of the injunction, including without limitation, any websites and/or online marketplace platforms such as Alibaba, AliExpress, Amazon, eBay, Etsy, DHgate, Fruugo, Redbubble, Spreadshirt, and Wish (collectively, the "Third Party Providers") shall disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using Plaintiff's Trademark;

3) That Defendants account for and pay to Plaintiff all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of Plaintiff's Trademark be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

4) In the alternative, that Plaintiff be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of Plaintiff's Trademark;

5) Plaintiff is further entitled to recover its attorney's fees and full costs; and

6) Award any and all other relief that this Court deems just and proper.

Dated this 16th day of September 2022.          Respectfully submitted,

/s/ Martin F. Trainor
Martin F. Trainor
TME Law, P.C.
3339 S. Union Avenue
Chicago, Illinois 60616
708.475.1127
martin@tme-law.com

*Counsel for Plaintiff Not a Real Holding Company Inc.*